NOT DESIGNATED FOR PUBLICATION

No. 119,943

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.E., E.E., K.E., and S.E.,
Minor Children.

MEMORANDUM OPINION

Appeal from Kingman District Court; R. SCOTT MCQUIN, judge. Opinion filed March 8, 2019.
Affirmed.

*Daniel O. Lynch*, of Johnston, Eisenhauer, Eisenhauer & Lynch LLC., of Pratt, for appellant
natural father.

*Matthew W. Ricke*, county attorney, and *Gregory C. Graffman*, guardian ad litem, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Father appeals the termination of his parental rights to his four
children, K.E., J.E., E.E., and S.E. The district court terminated both Mother and Father's
parental rights, but this appeal concerns Father only. The district court found that Father
is unfit, that the condition or conduct rendering him unfit is unlikely to change in the
foreseeable future, and that termination is in the best interests of the children.

Father presents two arguments on appeal. First, he argues that the State did not
present evidence to show that he was unfit and his conduct was unlikely to change in the
foreseeable future. Second, he argues that the district court's determination that
termination was in the best interests of the children was an abuse of discretion. Finding
no error, we affirm.

1

*Factual and Procedural Background*

Mother and Father have four children: J.E., born in 2005; E.E., born in 2006; K.E., born in 2007; and S.E., born in 2008. The children have physical, developmental, and emotional needs, some of which may be attributable to the time they have spent in state custody. Three of the children are developmentally delayed and have some trauma from being removed from the home in the past. One of those three has hearing issues and participates in speech therapy at school. The fourth is moderately autistic and has a sensory disorder. He is noncommunicative and could not be interviewed.

The family has an extensive history involving the Department for Children and Families (DCF):

- 12/08/06: J.E. and E.E. were removed from the home and placed in DCF custody

- 10/31/07: K.E. was born

- 06/20/08: Children were removed from the home and placed in DCF custody

- 09/08/08: Visitation was moved from the home to St. Francis Community Services (SFCS) office due to no heat in the home

- 09/09/08: S.E. was born

- 09/12/08: S.E. was removed from the home and placed in DCF custody

- 02/06/09: Children were reintegrated in the home

- 08/20/09: Children were released from DCF custody

- 05/09/14: Children were removed from the home and placed in DCF custody

- 08/21/14: Children were reintegrated in the home and released from DCF custody

- 09/05/14: Children were removed from the home and placed in DCF custody

- 08/13/15: Children were reintegrated in the home

- 12/03/15: Children were released from DCF custody

- 09/14/17: Children were removed from the home and placed in DCF custody

For the current cases, the State filed petitions in September 2017 contending that all four children were children in need of care, alleging that K.E. had been physically abused, and that the other three were residing in the same residence as a sibling who had been physically abused. The children were removed from the home and placed in DCF custody.

The first case plan meeting with SFCS was scheduled for October 2, 2017. Neither Mother nor Father attended the meeting, either in person or by phone. SFCS held subsequent meetings on October 26, 2017, November 9, 2017, and January 4, 2018, where they reviewed the case plan tasks and what Mother and Father could expect during the reintegration process.

In December 2017, Father stipulated that these four children were children in need of care. In January 2018, the district court held a dispositional hearing. There, the district court adopted the case plan tasks, suspended visitation, found that reintegration was not a viable option, and directed the State to file a motion to terminate Mother and Father's parental rights.

At the termination hearing in April 2018, the State presented testimony from DCF and SFCS employees Teri Owens, Cassandra Allen, Andrea Cummings, Kathy Merkey, and Tammy Black. Mother and Father each testified on their own behalf.

3

Through the State's witnesses' testimony, the court learned that the children have spent a significant amount of time outside the home and out of Mother and Father's care. All the children were young when they were first removed from the home. Each time they were removed, it was because of mental health concerns, the deplorable conditions of the home, not enough food in the home, and an inability to pay bills. And in 2017, the children were removed from the home due to the physical abuse of K.E.

Merkey, the DCF employee who first responded to the reports of bruises on K.E., testified about concerns of physical abuse in 2017. She testified that she sees many children in her line of work and that bruises—especially ones on the shins, hips, and knees—are common with active kids. But Merkey observed more concerning bruises on K.E. in September 2017, including ones located on the backs of his legs and a large bruise on his back. Merkey referred the case to Dr. Kerri Weeks, the director of the Division of Child Abuse and Neglect at Wesley Children's Hospital in Wichita, who concluded that K.E. suffered physical abuse.

The condition of the home has been an issue throughout DCF's lengthy involvement in the case. It remains one of the biggest barriers to reintegration, as Mother and Father cannot maintain their home at minimum standards for the health and safety of their children. Black, a case worker who observed the home on three separate occasions, described the home as one of the worst she had ever been in. Black went on a walkthrough of the home in November 2017, after the children were out of the home. Even though the visit was not an unannounced visit, the home was filthy, with feces, gum, food, and other substances on the walls and the floor. The feces on the wall were dry and ground in, suggesting that they had been there for a long time. Trash was scattered throughout the home and directly outside the home, which brought rodents and bugs, and there was mold in the bathroom. Black testified that the house smelled horrible, causing her to cough and making it difficult to breathe for up to 24 hours after leaving the home. The home contained little evidence of the children's personal belongings, their

4

living and sleeping spaces were not safe, and the children's beds had holes in them and were not on the bed frames. The holes in the mattresses exposed the springs and inner makings of the mattress. There were no sheets on the mattresses, and the mattresses were filthy. Allen, the children's caseworker at SFCS, was concerned about the children's safety due to the exposure of the inner insulation of the mattresses, as well as the filth and spots on the surface of the mattresses, which she feared could be airborne and inhaled. Little had changed by the time Black went back in January 2018. The feces were still present on the walls, and photographs of the home showed that they were the same ones as the ones before.

Case workers testified about what they look for when determining whether a home meets minimum standards to be safe and suitable for children. They acknowledged that with four children in the home, they would expect to see toys and clothes lying around and did not expect the home to be perfect. They look for health and safety concerns, though, and found those concerns present in Mother and Father's home. Allen testified that "[w]e need it to be safe for the children, meaning feces is not safe. Trash around the house is not safe. The condition of the beds that the children were sleeping on . . . [was] not safe."

Cummings testified that there was "trash piled up and we had rodents and bugs, diapers thrown around, food on the floor and the kids are eating off the floor, and the floor sticky when you step on it, a kid running around with butter knives one time. So the things we were addressing were health and safety concerns, not, You need to dust." The condition of the home was a safety hazard for the children, and in an attempt to help Mother and Father get their home up to minimum standards, Black brought over $100 in cleaning supplies to the house. But the conditions did not improve, and the supplies were still sitting in the same spot when she returned on her next visit a month or so later. Allen testified that the condition of the home was even more concerning considering the children were removed from the house and Mother does not work.

The children also have substantial mental health needs that are not being addressed. J.E., E.E., and S.E. have developmental concerns and have unaddressed trauma from their unstable home life. K.E. presents the biggest concern because of his autism diagnosis and other developmental issues. He is very active, constantly running around and jumping off furniture. He suffered physical abuse in the home, substantiated by DCF after being seen by a child abuse specialist, but because of his developmental concerns and difficulty communicating, case workers were unable to interview him. Despite the children's needs, Mother and Father did not provide the children with the mental health services or proper medication they needed, and Father does not believe in mental health treatment. Mother claimed that Arrowhead West, a service provider in Kingman County, has no services for K.E. She testified that K.E. is on a list for services, but that list has a 6 to 10 year waiting period. She said that she has tried other groups, but she keeps running into "a waiting list for a waiting list for a waiting list for another waiting list."

Mother and Father have been uncooperative since the beginning of DCF's involvement with the family. SFCS offered Mother and Father assistance with many case plan tasks. They gave them a resource guide that listed the classes they were requested to take and where they could take them, provided cleaning supplies and new beds, offered Mother assistance finding employment, offered gas vouchers, paid for the trash bill, and arraigned for large trash items from the home to be hauled away. Despite SFCS's involvement, Mother and Father made little progress on their case plan tasks. Allen reported no motivation to complete case plan tasks and no progress in the five-month period that she worked with the family. Father continuously told Allen that he did not believe in mental health or mental health treatment, so he would not follow through on any of the case plan tasks related to mental health services. Father reported that he was employed but refused to verify his employment by submitting paystubs, telling SFCS that it was none of their business. He also said that it was against his constitutional rights to have to provide pay stubs as proof of employment or rent and utility payment receipts.

Father also has unaddressed anger issues and did not complete his anger management class requested as part of his case tasks. He showed anger toward family support workers, and Cummings had to intervene one time when a support worker felt like she was in danger after a confrontation. Father's anger was concerning to case workers entering the home.

Mother and Father refused to complete a budget, although their case plan required it, because Father believed it was no one else's business. Although Mother claimed that they have a budget, Mother and Father do not seem to have a handle on their finances. Case workers assumed the family had problems with money and their budget because they often lacked food or could not afford cleaning supplies, had their utilities turned off, or had their trash services canceled. Mother and Father told case workers they did not have money for necessities such as their bills or trash removal, but caseworkers observed items such as new flat screen televisions and a new computer. Mother does not seem to be involved with the family's finances. She said that they have a budget, but she does not know Father's monthly income. She estimated that he makes about $2,000 per month, but that his paycheck varies. She said she does not really know, but would estimate that their monthly bills added up to $600 to $800. She testified that when the children are in the home, the family spends $600 to $800 per week on necessities, including groceries and personal hygiene items, or between $2,400 and $3,200 per month. Father also could not say how much their bills were, but said they probably average to around $800 per month.

Although there was some confusion about the amount of their bills and their spending habits, testimony showed that there likely should have been enough money for the necessities that the family was lacking. Father is the sole source of income for the household. He has been employed at the same job for the last 10 years, and he works about 72 hours per week. He makes $18 per hour, and he gets paid time and a half for the 32 hours per week he works overtime. His employment has provided a stable place for

7

the family to live—they have lived in their house for 12 years on a rent-to-own basis, and they are scheduled to pay off the house in one year.

In addition to Mother and Father's refusal to complete a budget, leading to apparent money mismanagement, Father's lack of effort was pervasive throughout DCF's involvement in the case. Once, they held a case plan meeting in the home and Father would not get off the couch to sign the paperwork, and the case worker had to walk the papers over to him on the couch to get them signed. Then, when the State moved for termination, Father stopped any semblance of working on his case plan tasks. Allen advised Mother and Father that although the court ordered the State to file a motion for termination, they should continue working on the case plan tasks up until the termination hearing. However, Mother and Father told Allen that they wanted to wait and see how the termination hearing went before trying to complete any case plan tasks. They maintained this stance even after Allen explained that continuing to work on the case plan tasks up until the date of the termination hearing could help them avoid termination and even asked Allen to not contact them. However, at the hearing, Father testified that although he had not yet completed many of his case plan tasks, he would be willing to do so given more time.

Mother testified that she has depression, which affects her ability to keep her house clean. She said she has been working on the house, including washing the walls and floors in the children's bedrooms, as well as doing the laundry and dishes daily, and that she works every day to change. Mother has not been employed during DCF's involvement with the family. She testified that she was employed for about six months once but that it was "a complete disaster" because of Father's schedule and having to bring the children with her sometimes. Now, Mother does not want to get a job. She said that the places she has applied to said that they can only guarantee part-time work and does not think a part-time job would help their financial situation.

8

When talking about reintegration, both Mother and Father expressed that their home is still not suitable for the needs of all of their children. Tellingly, Mother testified that K.E. would do better outside the home: "As much help as my son needs, and like I said, I mentioned a moment ago, I hate to send my kid away, but [K.E.] deserves better, and we can't even—if I held down three jobs, couldn't afford medication, the therapy, the special things that he needs." Father, too, noted that as of the termination hearing, the home was still not in a condition that would be safe and suitable for the children despite them being out of the home for months.

The court took judicial notice of the four previous cases in which the children had been removed from the home, as well as two cases from 2006 in which Mother and Father were convicted of child endangerment. At that point, several hours into the termination hearing, the parties realized that the presiding judge, Judge Meisenheimer, had represented Father in prior CINC cases. Judge Meisenheimer recused himself and Judge McQuin was assigned to the cases. Judge McQuin reviewed the transcript from the termination hearing and heard closing arguments in July 2018.

The district court found clear and convincing evidence that Mother and Father were unfit by reason of conduct or condition which rendered them unable to care properly for their children and that the conduct or condition was unlikely to change in the foreseeable future. It based its findings on K.S.A. 2018 Supp. 38-2269(b)(4), (7), and (8), and the presumptions of unfitness in K.S.A. 2018 Supp. 38-2271(a)(3), (5), and (6), which were unrebutted. Its rulings are reflected in statements made on July 13, 2018, and in two orders. The supplemental order filed July 25, 2018, adopted the oral argument of the guardian ad litem as the court's findings of fact and conclusions of law to supplement its previous findings.

Father has timely appealed.

9

*Legal Principles*

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2018 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2018 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2018 Supp. 38-2269(c). The State may also rely on one or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 2018 Supp. 38-2271.

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit and against Father.

10

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). As directed by the language of K.S.A. 2018 Supp. 38-2269(g)(1), the district court gives "primary consideration to the physical, mental and emotional health of the child." The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The best interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*The district court did not err in finding that Father is unfit and that his conduct or condition is unlikely to change in the foreseeable future.*

The district court found multiple reasons to terminate Father's parental rights:

K.S.A. 2018 Supp. 38-2269(b)(4) - physical, mental, or emotional abuse or neglect or sexual abuse of a child;

K.S.A. 2018 Supp. 38-2269(b)(7) - failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; and

K.S.A. 2018 Supp. 38-2269(b)(8) - lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

11

It also found the evidence met three statutory presumptions of unfitness, which Father did not rebut:

K.S.A. 2018 Supp. 38-2271(a)(3) - on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care as defined by K.S.A. 2018 Supp. 38-2202(d)(1), (d)(3), (d)(5), or (d)(11), and amendments thereto, or comparable proceedings under the laws of another jurisdiction;

K.S.A. 2018 Supp. 38-2271(a)(5) - the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home;

K.S.A. 2018 Supp. 38-2271(a)(6) - (A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future.

Father challenges the findings of unfitness and claims to have rebutted the presumptions of unfitness. He also claims that the evidence does not support the district court's finding that his conduct or condition that renders him unfit is unlikely to change in the foreseeable future. When evaluating the foreseeable future, we use "child time" as the measure. As the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different

12

perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). In addition, courts may look to the parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P. 2d 467 (1982).

*Neglect or abuse*

Although Father challenges most of the reasons the district court cited for finding him unfit, Father does not challenge the district court's finding that he was unfit due to physical, mental, or emotional abuse or neglect of a child. See K.S.A. 2018 Supp. 38-2269(b)(4). Father admitted at the termination hearing that the home was still not suitable for the children's reintegration, even when they had been out of the home for months. Father works long days, admittedly does very little to help around the house, and showed little interest in helping clean it up. Even after the children were removed from the home, the condition of the home remained deplorable and never met minimal standards. Reports of abuse against K.E. were substantiated. Testimony about the continually filthy living conditions in the home and the parents' failure to provide for the children's physical safety and mental health needs easily meets this statutory standard. Evidence of neglect or abuse provides a sufficient and compelling basis to find Father unfit, independent of any other factor.

*Failure of reasonable agency efforts*

But other factors also support the district court's findings. Despite Father's contentions otherwise, appropriate public and private agencies made reasonable efforts to rehabilitate the family. See K.S.A. 2018 Supp. 38-2269(b)(7). SFCS and case workers

13

from DCF offered help to Father several times. SFCS purchased new beds and cleaning supplies, provided the family with a resource guide that listed the classes they were requested to take and where they could find them, and offered gas vouchers, but Father did not take advantage of the help offered.

Father's primary argument here is that he was not given sufficient time to work through his case plan. He cites Allen's testimony that most families would need four to six months to do so, yet his full case plan was not adopted until the same hearing at which the district court ordered the State to file a motion to terminate, and he received no services after that. Nonetheless, Father admits he knew of some of the case plan tasks in this case before the full case plan was adopted. Father attended meetings on October 26, 2017, November 9, 2017, and January 4, 2018, where he reviewed the reintegration case plan tasks. So Father had several months to complete tasks in this case, and Father had years of experience with case plans because of his involvement in previous CINC cases.

Father also claims that when he was given time and assistance in his prior CINC cases, he successfully made progress on his case plan tasks to have the children reintegrated. He claims he is willing to work on his case plan tasks if given more time and assistance. But Father relies solely on his own testimony. The evidence, viewed in the light most favorable to the State, refutes Father's assertions. Father's past conduct shows that he is unable or unwilling to change in a way that creates a suitable environment for the children. The children have been removed from the home five times, yet each time they were reintegrated they were removed again *under similar conditions*. Throughout DCF's years of involvement, from 2006 to 2018, Father has been unwilling to complete case plan tasks, and this time has been no different—Father had several months to change his behavior and the condition of the home, but he refused to do so.

*Lack of effort by Father*

Father also challenges the district court's finding he showed insufficient effort to adjust his circumstances, conduct, or conditions to meet the needs of the child. See K.S.A. 2018 Supp. 38-2269(b)(8). Father lists several factors that he claims rebut the district court's finding that his unfitness is unlikely to change in the foreseeable future.

Father argues that he provides money, insurance, and stable housing for the family through his employment, that for the last six months he has had no problems paying bills and keeping the utilities on, that he has never failed a drug test, that he obtained new beds for the children with the help of SFCS, that he participated in 9 of the 11 visits with his children, and that the other two were canceled, and that neither he nor Mother used physical discipline during those visits. But these arguments miss the mark—they do not address the problems that caused the court to find the children in need of care and Father unfit.

Instead, Father made little to no effort to adjust his circumstances, conduct, or conditions to meet the needs of his children. Father refused to create a budget, complete parenting and anger management classes, participate in mental health services, or do other case plan tasks that would show a willingness to achieve reintegration with the children. Although Father knew that he could keep working on the case plan tasks up until the termination hearing, he became completely noncompliant and stopped working on them when the State filed its motion for termination, and he asked SFCS to not contact him. Father made a conscious decision to do nothing until he knew the results of the termination hearing, refusing to change his behavior to show he could address the issues identified by DCF and the court.

Father has shown minimal effort throughout DCF involvement in the case. And the months leading up to the termination hearing—when Father refused to continue

15

working on the case plan tasks—proved that reintegration was not viable. Clear and convincing evidence supports the district court's finding that Father is unfit and that his unfitness is unlikely to change in the foreseeable future.

We find it unnecessary to address the presumptions of unfitness.

*The district court did not err in finding it in the best interests of the children to terminate Father's parental rights.*

Finally, Father claims error in the district court's determination that termination of Father's parental rights was in the best interests of the children. He claims he has worked hard to support his family, providing them with insurance and a stable home for the last 12 years. He points out that there have been no allegations of substance abuse, and that he appropriately engages with his children.

Despite Father's contentions, we find that the district court acted within its discretion in finding that termination was in the best interests of the children. The children need permanency, and they do not have it because of Mother and Father's persistent choices. Their unstable home life has affected the children—they have shown signs of trauma and developmental delays because of previous removals from the home. K.E. likely needs a special placement to meet his needs; even Mother suggested that it would be best for K.E. in particular to be in a different setting. Reports of abuse against K.E. were substantiated. The children need to be in a safe and suitable home where they can receive mental health services and medication when appropriate. Remaining in the home is not in the best interests of the children.

We find that the district court properly considered the physical, mental, and emotional needs of the children before finding that it is in the children's best interests to terminate Father's parental rights. It did not abuse its discretion in doing so.

16

Affirmed.